**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-20682

_____


FEDERAL DEPOSIT INSURANCE CORPORATION,
statutory successor to the
Resolution Trust Corporation,
as receiver of Commonwealth Federal Savings Association,
Commonwealth Mortgage Corporation of America,
and COMMONWEALTH MORTGAGE CORPORATION OF AMERICA,
as liquidating trustee of Commonwealth Mortgage
Corporation of America, L.P.,
a terminated limited partnership,

Plaintiff-Counter-Defendant-
Appellee-Cross-Appellant,

VERSUS

TRANSWORLD MORTGAGE CORPORATION,
ROUSSEAU MORTGAGE CORPORATION,
and
MONDRIAN MORTGAGE CORPORATION,

Defendants-Counter-Claimants-
Appellants-Cross-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Texas
(CA-H-94-1825)

_____

July 1, 1997

Before DAVIS, SMITH, and DUHÉ, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Transworld Mortgage Corporation appeals, and the Federal Deposit Insurance Corporation ("FDIC") cross-appeals, a judgment awarding monetary damages to both parties and injunctive relief to the FDIC. We affirm in part, reverse in part, and vacate in part.

## I.

This is primarily a breach of contract case stemming from a sale of residential mortgage servicing rights. The mortgage companies from which prospective homeowners obtain mortgages typically sell their loans to investors. When a loan is sold, the mortgage company frequently enters into an agreement with the investor to service the loan on the investor's behalf. That is, the mortgage company, as servicer, agrees to collect the homeowner's monthly payments of principal and interest and forward them to the investor.

In the usual arrangement, the servicer also agrees to collect escrow funds to pay taxes and insurance; when a homeowner misses payments, the servicer often is required to advance funds to pay these expenses. Similarly, when a homeowner defaults on his obligation, the servicer may be required to advance funds to pay for expenses associated with foreclosure. These funds are referred to as "advances."

Commonwealth Savings Association, a Texas savings and loan institution, failed in 1989, emerged from receivership as Common-

wealth Federal Savings Association ("Commonwealth Federal"), and failed again in 1991. The Resolution Trust Corporation ("RTC")[1] placed it into a second receivership and assumed control of one of its subsidiaries, Commonwealth Mortgage Corporation of America ("CMCA"), the general partner of Commonwealth Mortgage Company of America, L.P. ("CMCA-LP").

The RTC subsequently undertook to liquidate the assets of CMCA-LP, consisting principally of servicing rights to mortgages and advances on servicing-related expenses. Transworld Mortgage Corporation ("Transworld") was the highest bidder and thus began to discuss the terms of sale of CMCA-LP's servicing rights with the RTC in July 1990.

After extensive negotiations and an apparently rushed due diligence review, the parties entered into four related contracts: (1) a May 2, 1991, Comprehensive Asset Purchase and Sale Agreement (the "CAPSA") by which CMCA-LP bought most of Commonwealth Federal's physical assets and Commonwealth Federal bought various CMCA-LP assets that were not to be transferred to Transworld, including $100 million in advances; (2) a May 3, 1991, Purchase and Sale Agreement (the "PSA") whereby CMCA-LP sold its servicing rights and physical assets to Transworld; (3) a June 1, 1991, Loan Servicing Agreement (the "LSA") whereby Transworld agreed to service certain of Commonwealth Federal's loans in exchange for a

---

[1] Since these events, the RTC has been statutorily succeeded by the FDIC.

3

fee; and (4) a June 1, 1991, Management Agreement for Collection of Receivables (the "Collection Agreement") whereby Transworld agreed to "collect" both CMCA-LP's "Outstanding Advances" and any new advances that came into existence as a result of servicing the defaulted loans. Most of the parties' disputes revolve around the interpretation of these contracts, particularly the latter three.

The Collection Agreement obligated Transworld to collect advances for three years, after which time it could resign, with or without cause. During the three-year period of its obligation, Transworld collected approximately $70 million of CMCA-LP's Outstanding Advances and assessed a $10 million fee. As the three-year period came to a close, however, the relationship between the parties began to sour. Transworld saw that the cost of collecting the remaining advances would be greater than the fees it projected it would earn, and it consequently gave the RTC the required thirty days' notice of its decision not to extend the Collection Agreement.

The RTC simultaneously became dissatisfied with Transworld's default administration, collection, accounting, and remitting practices. Following Transworld's termination of the Collection Agreement, a dispute arose as to whether Transworld was entitled temporarily to retain certain RTC funds.

II.

The RTC filed suit in May 1994, alleging numerous violations

4

of the agreements.  Transworld counterclaimed for monies owed under the contracts and fraudulent inducement.  After a thirteen-day bench trial, the district court found in some respect for each side under the contracts, awarding the RTC approximately $10 million and Transworld approximately $360,000, both sums in addition to interest and attorney's fees.  The court also awarded the RTC extensive injunctive relief, prohibiting Transworld from any further use of RTC funds and requiring a detailed accounting of the funds previously used.  Both sides now appeal.

### III.

Transworld avers that the district court erred in failing to award it three sets of fees for its collections of advances: (1) fees for collecting the positive and negative escrow funds kept by CMCA-LP; (2) fees for collecting advances on Commonwealth Federal's so-called "020 loans;" and (3) fees associated with collections on the Outstanding Advances for loans Commonwealth Federal sold to GE Capital.  These claims present issues of contractual interpretation, and we therefore review the district court's conclusions *de novo*.[2]  *E.g., National Union Fire Ins. Co. v. Care Flight Air Ambulance Serv.,* 18 F.3d 323, 325 (5th Cir.

---

[2]  The FDIC argues that, because the district court made a factual finding that Transworld had failed to "collect" the funds at issue, the proper standard of review is clear error.  This is incorrect.  Whether Transworld "collected" the funds is a mixed question of law and fact, and the district court's factual findings were predicated upon its legal ones in this regard.  Because we disagree with the district court's interpretation of the term "collect," its factual findings under its interpretation are inapposite.

5

1994).

A.

Transworld argues that it is owed collection fees for work it performed in reconciling CMCA-LP's escrow funds. Two types of funds were reconciled: "positive" escrow funds, which contained reimbursement for advances of which CMCA-LP was apparently unaware, and "negative" escrow funds, which in the aggregate also contained money but appeared not to because of accounting errors. Transworld's reconciliation revealed approximately $5,000,000 in the positive escrow accounts and $500,000 in the negative ones. As compensation for this, Transworld assessed CMCA-LP fees of $2,092,205 and $145,000, respectively.

As article VII of the Collection Agreement entitles Transworld to fees based on its collection of "Outstanding Advances," our first task is to determine whether the monies in the positive and negative escrow accounts fall within the contractual definition of that term. The district court found that they did not. Our analysis of the contract leads us to disagree.

The relevant provision is straightforward. The Collection Agreement defines an "Outstanding Advance" as

> the outstanding amount as of the applicable Transfer Date, that has been advanced by [CMCA-LP] from its funds in connection with its servicing of the Mortgage Loans (including without limitation principal, interest, taxes, ground rents, assessments, foreclosure related advances, insurance premiums and other expenses) and for which [CMCA-LP], as Servicer has a contractual right of

> reimbursement from Mortgagors, Insurers, Investors or otherwise, all of which are detailed on Exhibit A attached hereto and made a part hereof.

As Transworld points out, the positive and negative escrow funds are listed in Exhibit A. Because the FDIC offers no persuasive argument to refute the obvious conclusion that the parties meant the funds to be within the definition of "Outstanding Advances," we hold that they are so included.

The district court also found, however, that the positive and negative escrow funds were not "actually collected" by Transworld, in the sense that the money at issue was already in the accounts prior to Transworld's reconciliation. The correctness of this determination hinges on the meaning of the term "collect," which the Collection Agreement does not define.

Transworld urges us to apply the common dictionary definition of the term: to gather or assemble. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 444 (1986). The district court implicitly adopted, and the FDIC now explicitly argues for, on the other hand, the meaning typically used in financial and commercial settings: to call for and receive payment.

Although the financial definition appeals to us in the abstract, to employ it here would render the relevant portion of the Collection Agreement a virtual nullity. It is undisputed that the funds in the escrow accounts already had been remitted to CMCA-LP when Transworld reconciled and combined them into a pair of

7

lump-sum payments. It is also undisputed that article VII of the Collection Agreement entitles Transworld to a fee for collecting the sums in the accounts. If CMCA-LP had already "collected" the money in the escrow funds, why would it have agreed to pay Transworld to do something that had already been done?

The FDIC's proposed construction is unreasonable and would strip this provision of meaning. *See Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co.*, 99 F.3d 695, 706 (5th Cir. 1996). To accept it would require us to conclude not only that CMCA-LP agreed to pay Transworld for something that had already been done, but also that it agreed to pay for the "collection" of already-collected money that became Transworld's under the PSA. Transworld's interpretation of "collect" is the only one that makes sense within the contractual framework, and we adopt it.

The FDIC protests that Transworld already has been paid for collecting the escrow funds with a $950 per-loan fee provided for in the PSA. Setting aside for the moment the inconsistency between this argument and the previous one, we are not persuaded. The $950 fee was provided for in the PSA, article 4.3(ii)(g) of which characterizes it as a "credit" against the purchase price of certain loans. By its own terms, the PSA directs that Transworld's collection of advances and compensation therefor are to be governed not by it but by the Collection Agreement. Moreover, under other provisions of the PSA, CMCA-LP was expressly obligated to perform

8

the reconciliation that the FDIC now claims it paid for with the $950 fee.

The FDIC's interpretation is simply implausible. Considerably more likely, we think, is Transworld's contention that the $950 fee was irrelevant to its compensation for straightening out CMCA-LP's unkempt books.

This leads us to conclude that the district court erred in awarding the FDIC the $2,237,205 Transworld withheld on the positive and negative escrow accounts. Accordingly, we reverse and render judgment in favor of Transworld in this amount.

B.

Transworld contends that the district court erred in failing to award it fees for the collection and remittance of Commonwealth Federal's 020 loans. The court's denial of recovery was based on its conclusion that the Collection Agreement does not apply to loans wholly owned by Commonwealth Federal. The majority of this dispute involves questions of contractual interpretation reviewable *de novo*.

The district court's interpretation of the contracts was correct. By its own terms, the Collection Agreement governs advances on only those loans for which the servicing rights were sold in the PSA. Transworld protests that the advances on the 020 loans fit within the Collection Agreement's definition of "Out-

9

standing Advances" and therefore must be governed by it.

As Transworld stipulated at trial, however, the PSA did not effect a sale of servicing rights to the 020 loans. Rather, those rights were sold under the LSA, which provides that "[n]o additional compensation other than that provided for hereunder shall be payable to [Transworld] for the services described herein except as set forth elsewhere in this Agreement . . . ." Notably, the LSA does not require Transworld to collect Outstanding Advances on the 020 loans.

The degree to which the 020 advances fit within the Collection Agreement's definition of "Outstanding Advances" makes this one of the more difficult interpretative issues. Notwithstanding this fit, however, we think that the fact that the 020 loan servicing rights were not sold under the PSA must exclude them from the Collection Agreement's coverage at the outset. Since the Collection Agreement does not apply, there is no contractual language obligating Transworld to collect advances on the 020 loans, and therefore no contractual obligation on the FDIC's part to pay a fee for such collection.

Yet the parties seem to have thought otherwise, at least at the time the relevant events were taking place. Transworld, after all, collected and remitted to the RTC $7 million in advances on the 020 loans. Because of this, it now argues, in the alternative, that it should recover a collection fee of $2,095,576 under a

theory of *quantum meruit*. The district court rejected this contention on the basis that "[t]he contracts, which describe the fee arrangements between the parties, control."

It is true that, on its face, the "no additional compensation" language of the LSA appears to define the whole of Transworld's compensation for services rendered on the 020 loans. But the crucial qualification comes later in the sentence§§"no additional compensation" shall be paid "for the services described herein."

Collecting advances was not one of the services described within the LSA; it was described in the Collection Agreement, which Transworld (and the RTC, insofar as it did not object to the $7 million payment) appear to have thought covered the 020 loans. Because the collection of advances is not a service "described herein," the LSA does not bar payment of fees for it *per se*. But neither is it explicitly authorized under the Collection Agreement.

In light of the parties' behavior, the contractual language on which the district court relied does not bar recovery in *quantum meruit*. The inquiry into whether *quantum meruit* is appropriate in any particular circumstance is a fact-intensive one, however. Because the district court rejected this theory based on its view of the parties' contracts, the record before us lacks sufficient factual development for us to express a view on the merits of this issue. Consequently, we affirm the district court's conclusions as to Transworld's recovery under the LSA and the Collection Agree-

11

ment, but we remand for reconsideration of the appropriateness of *quantum meruit*.

## C.

Transworld's next contention is that the district court erroneously denied it recovery of fees relating to its collection of advances on loans Commonwealth Federal sold to GE Capital. For purposes of our analysis here, these are in virtually all respects identical to the fees associated with the 020 loans discussed above. Because the servicing rights to the GE Capital loans were not sold through the PSA, the collection of advances on them was not covered by the Collection Agreement.

As with the 020 loans, however, it appears from the record that Transworld may have rendered valuable services for which it has not been compensated. Again expressing no opinion on the ultimate resolution of this issue, we affirm the district court's interpretation of the applicable contracts and remand for reconsideration of whether Transworld is entitled to recover under *quantum meruit*.

## IV.

Transworld challenges the award to the FDIC of $791,000 for Transworld's failure to collect advances as required by the Collection Agreement. The basis for the award was the finding that

12

the Collection Agreement imposed a duty on Transworld to comply with all laws, rules, and regulations applicable to its servicing of the RTC's loans, and that Transworld had violated that duty on numerous occasions.

Some of the loans that Transworld contracted to service were subject to Federal Housing Administration, Department of Housing and Urban Development ("HUD"), and Department of Veterans Affairs ("VA") regulations. The district court held that by failing to follow the regulations requiring it to (1) perform work-outs with mortgagors; (2) promptly proceed to foreclosure; (3) process claims in accordance with VA and HUD procedures; (4) pay Commonwealth Federal certain collected funds; and (5) properly advance foreclo-sures so as to avoid loan curtailment, Transworld breached its contract and caused substantial losses to the RTC.

We begin, as we must, with the language of the contract. *Gallup v. St. Paul Ins. Co.*, 515 S.W.2d 249, 250 (Tex. 1974). Article III of the Collection Agreement requires Transworld to "seek to collect" Outstanding Advances and Default Portfolio Advances in conformity with

> all applicable state, federal and other governmental laws, rules and regulations and the requirements of any Insurer or Investor, with respect to the servicing of the Mortgage Loans and the collection of the Outstanding Advances and Default Portfolio Advances, including the giving of all necessary and appropriate notices and the submission of claims.

Similarly, in Article V(a) Transworld agreed to "make reasonable

13

efforts to collect and recover all Outstanding Advances and Default Portfolio Advances . . . as if [Transworld] were the owner thereof."

Transworld attempts to escape from this language by arguing that because it was obligated only to "seek to collect," it cannot be held liable for an actual failure to collect unless the FDIC demonstrates that it did not use "reasonable efforts." Transworld points to the contingent nature of its obligation to collect advances and to language in the Collection Agreement placing the risk of loss of the Outstanding Advances on the RTC.

In large part, this argument misses the point. It is true that Transworld was bound only to attempt to collect the Outstanding Advances rather than actually to collect them. But the "seek to collect" language in the Collection Agreement is closely followed by the requirement that Transworld abide by the relevant governmental regulations.

The basis of Transworld's liability in the district court was its failure to comply with these regulations in the course of those efforts. The finding that it did not abide by the relevant standards is a factual one that Transworld does not challenge on appeal. The conclusion that the Collection Agreement's "seek to collect" language did not excuse it from the industry standards is a legal one in which we see no error. As we agree with the district court's interpretation of the Collection Agreement, we accordingly affirm the award of $791,000 to the FDIC.

V.

Transworld claims that it is entitled to indemnity under the PSA for two types of losses it sustained in the course of performing its contractual obligations.  The first is losses arising from Transworld's "buydowns" of defaulted loans guaranteed by the VA; the  second is losses Transworld claims it incurred in settling a lawsuit brought by a class of parties in bankruptcy.  The district court denied relief on both claims.

According to the PSA, a buydown is a

> waiver by [Transworld] of a portion of the indebtedness of a VA guaranteed Loan, which can take the form of a reduction of the Principal, a credit to escrow or unapplied funds accounts, the forgiveness of Accrued Interest or any combination of the foregoing, [] in order to induce the VA to pay to the mortgage holder the remaining amount of the indebtedness owed under the Loan and acquire title to the Collateral.

The PSA provides that Transworld is indemnified for any buydowns initiated within two years of its effective date.  The first dispute thus hinges on precisely what "initiates" a buydown within the meaning of the contract.  Transworld claims that, because every buydown involves a foreclosure, a buydown is initiated when the property is referred to an attorney for foreclosure.  The FDIC, pointing out that not every foreclosure leads to a buydown, contends that a buydown is not initiated until Transworld receives a no-bid notice from the VA and informs the VA of its intention to waive part of the indebtedness.

There is little support for Transworld's position.  Although

15

the PSA and the VA's loan servicing guide state the rather unremarkable proposition that referral of a loan to an attorney for foreclosure initiates foreclosure proceedings, nothing in either indicates that a referral initiates a buydown. This makes perfect sense, for many such referrals result in foreclosures that do not involve a buydown. Transworld's reliance on the testimony of a witness who stated that a foreclosure was "one of the first steps" in the buydown process is thus misplacedSSone might just as easily say that the original extension of the loan initiates the buydown, as it is also a necessary step in the process. The district court's rejection of Transworld's first indemnity claim was not erroneous.

The second claim fares no better. In 1993, a group of debtors brought a class action against Transworld in bankruptcy court in Pennsylvania. The class action plaintiffs alleged misconduct in foreclosure tactics used by both Transworld but also by CMCA-LP. Transworld settled the suit without paying either actual or punitive damages; instead, it agreed to reimburse the class members' legal fees and pay for an audit of their loan files. Transworld thus claims that the PSA entitles it to indemnity for the portion of these expenses attributable to CMCA-LP's conduct, which it alleges total $299,954.27 plus costs and prejudgment interest.

This argument turns on whether the losses claimed were caused by Transworld's or CMCA-LP's negligence, for Transworld is entitled

16

to indemnity only for the latter.  Based on what little evidence pertaining to this claim was presented at trial, the district court made a factual finding that the losses were "a direct result of Transworld's violations of bankruptcy law."  Although we think this one of the closer issues in the case, our review of the record reveals nothing to convince us that this finding was clearly erroneous, and we accordingly affirm the judgment.

## VI.

Transworld asserts that the district court erred in concluding that it violated the Collection Agreement by continuing to use the RTC's uncollected advances and other funds after the agreement was terminated.  The FDIC contends, and the court found, that upon the termination of the Collection Agreement, Transworld lost its right to use RTC funds to service a group of loans known as the Default Servicing Portfolio, the sole exception being that article V(e) entitled Transworld to draw upon a three-month "set aside" reserve. The court awarded the RTC $4,325,729 on this claim and entered an injunction requiring Transworld to account for and deliver the amounts improperly used.  As the issues surrounding this claim deal almost exclusively with interpretation of the Collection Agreement, our standard of review is *de novo*.

Article V of the Collection AgreementSSthe provision that authorized Transworld to use RTC funds for Default Portfolio

17

AdvancesSSbegins with a limitation:  "Until the earlier to occur of (i) the termination of this Agreement and (ii) the collection of all Outstanding Advances and Default Portfolio Advances, [Transworld] shall . . . ."  The remainder of article V describes Transworld's obligations and the circumstances under which it may use RTC funds to satisfy Default Portfolio Advances.  Because the first sentence modifies everything that follows, the FDIC argues, Transworld's right to use the funds ended on termination of the agreement.

But article V must be read in conjunction with the remainder of the agreement.  The more specific provision dealing with termination is article XI, which provides:

> Upon termination of this Agreement, [Transworld] will account for and deliver to [CMCA-LP] all funds then held in the Collection Account and Operating Account, less only the compensation due [Transworld] hereunder and set aside other sums then due or available to [Transworld] for payment of Default Portfolio Advances, and will deliver to [CMCA-LP] all records and documents that it may have in its possession relating to each such Advance, except to the extent such Advance relates to a Mortgage Loan for which [Transworld] maintains the Servicing Rights.  [Transworld] shall return to [CMCA-LP] any remaining amounts after [Transworld] is no longer obligated to make any Default Portfolio Advances.

In essence, Transworld's argument is that this language means what it says:  The funds at issue were "other sums . . . available to [Transworld] for payment of Default Portfolio Advances," and thus did not need to be returned until the obligation to make Default Portfolio Advances ceased.

Transworld's argument is persuasive.  The FDIC, in contrast,

18

urges us to read a requirement into the Collection Agreement that simply is not there: that its obligation to fund Default Portfolio Advances and Transworld's commensurate right to draw upon its funds end when the contract is terminated.  However much article V might suggest this when viewed in isolation, we find this interpretation impossible to reconcile with the language of article XI.  The FDIC's and the district court's reading of the Collection Agreement render the above-quoted portion of article XI a nullity.[3]

Accordingly, the district court erred in holding that Transworld converted the funds it retained after the termination of the Collection Agreement.  This aspect of the judgment is reversed, and the injunction entered against Transworld is dissolved in all respects.


VII.

Transworld claims that the district court erred in denying its counterclaim of fraud in the inducement of the Collection Agreement, the PSA, and the LSA.  The court's rejection of this claim hinged on its finding that "[n]either party intentionally or negligently made representations that the other relied upon that are not subsumed by the terms of the agreements."  As this is a

---

[3]  The FDIC protests that Transworld's reading of articles V and XI itself creates a nullity out of a provision of article X permitting Transworld to purchase advances by mutual agreement of the parties.  We do not agree.  As Transworld points out in its reply brief, a purchase of advances might very well make sense if, following termination of the Collection Agreement, Transworld were to find itself saddled with collection obligations for which it was no longer being paid.

19

finding of fact, we review it for clear error. FED. R. CIV. P. 52(a).

Transworld raises an issue of pure law as well, however: that the district court based its factual conclusions on an erroneous interpretation of the applicable law. Specifically, Transworld contends that the district court should not have relied upon *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991), for the proposition that a fraudulent breach of duty must arise independently of a contract between the parties, because *Southwestern Bell* is a negligence case rather than a fraud case. *See id.* at 494-95. Rather, Transworld argues, the proper standard is that fraud in the inducement may be shown by parol evidence, even in the face of an "as-is" or "merger" clause in the contract. *See, e.g., Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (Tex. 1957).

This is correct; the district court evaluated Transworld's claim under the wrong legal standard. Such errors normally lead us to reverse, in accordance with our caselaw holding that judgments based on factual findings derived from a misunderstanding of substantive law cannot stand. *See, e.g., Mobil Exploration & Producing U.S., Inc. v. Cajun Constr. Servs.*, 45 F.3d 96, 99 (5th Cir. 1995).

It is difficult to see how the factual findings at issue here are "derived from" the district court's error of substantive law, however, as some of the more important ones do not depend upon it.

20

The court found, at the very least, that neither party relied on whatever misrepresentations the other might have made. This presumably includes misrepresentations both inside and outside Transworld's exercise of due diligence, so the parties' vigorous debate about the Texas law of investigation-related reliance is not dispositive.

Reasonable reliance, of course, is a necessary element of fraud under Texas law. *Norman v. Apache Corp.*, 19 F.2d 1017, 1022 (5th Cir. 1994). Even assuming *arguendo* that the various misrepresentations of which Transworld complains actually occurred, its fraud claim is vitiated by a factual finding that does not depend on the district court's misapprehension of substantive lawSSthe finding that it did not rely on the misrepresentations.

Our review of the record once again reveals a fairly close question as to whether this finding is clearly erroneous. What tips the balance to the FDIC is the relative sophistication of the parties and the extensiveness of the investigation that Transworld did conduct, however hurriedly. Recognizing that this investigation cannot bar Transworld's fraud claim *per se*, *see Roberts v. United N. Mex. Bank*, 14 F.3d 1076, 1081 & n.6 (5th Cir. 1994), we nonetheless think it highly relevant to whether the district court clearly erred in holding that Transworld failed to demonstrate reliance by a preponderance of the evidence.

Given this deferential standard of review, we do not see that

21

the district court committed such error.  As reliance is an essential element of Transworld's fraud claim, we affirm this aspect of the judgment.


VIII.

Transworld challenges the award of prejudgment interest on the damages awarded the RTC for Transworld's breach of the Collection Agreement.  Specifically, Transworld maintains, the district court erred both in setting the rate at 10% and in ordering that the interest would accrue from June 1, 1994.  As the FDIC concedes that the proper date is June 12, 1994 (the date on which the Collection Agreement actually terminated), we need concern ourselves only with the interest rate.  Its correctness turns on interpretation of the contract and is thus an issue of law reviewable *de novo*.  *See, e.g., National Union,* 18 F.3d at 325.

Under Texas law, a contract that does not specify a prejudgment interest rate is subject to a rate of 6% on damages that may be ascertained from the face of the contract.  TEX. REV. CIV. STAT. ANN. art. 5069-1.03 (West 1987).  Damages not ascertainable with a reasonable degree of certainty are subject to a prevailing market rate, currently set at its floor of 10%.  TEX. REV. CIV. STAT. ANN. art. 5069-1.05(2) (West Supp. 1997); *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 930 (Tex. 1988).  We have read these rules and the Texas cases interpreting them to mean that damages must be

22

ascertainable from the face of the contract in order for the 6% rate to apply. *See Atchison, Topeka & Santa Fe Ry. v. Sherwin-Williams Co.*, 963 F.2d 746, 751-52 & n.14 (5th Cir. 1992).

As the FDIC points out, the district court's calculation of damages went well outside the boundaries that Texas law draws upon the 6% rate. In determining the damages caused by Transworld's breach of its standard of performance, for example, the court heard testimony by accountants and reviewed extracontractual documents pertaining to the curtailment of the advances. Because this information was necessary to determine the damage award, the court properly applied a rate of 10%. Accordingly, we vacate the award of prejudgment interest and remand with instructions that it be re-entered as accruing from June 12, 1994.

IX.

The FDIC raises two claims by cross-appeal: that the district court's award of $136,000 to Transworld for auditing a group of adjustable rate mortgages violated the statute of frauds, and that a second award of $177,789.81 for shortages in the Federal Home Loan Mortgage Corporation ("FHLMC") account was erroneous because of laches and Transworld's failure to mitigate. We find little merit in these arguments.

As to the first claim, our review of the various agreements persuades us that the district court correctly found them to be

23

sufficient to satisfy the statute of frauds. As to the second, the award to Transworld was predicated on a series of factual findings, supported, for example, by testimony regarding Transworld's efforts to collect the funds in question within a reasonable amount of time. Nothing in the record suggests that the findings were clearly erroneous, and we accordingly affirm in this regard.

X.

For the foregoing reasons, we REVERSE the award of damages for improper assessment of collection fees on the positive and negative escrow funds and RENDER judgment for Transworld in the amount of $2,237,205. We AFFIRM the judgment regarding fees for collection of advances on the 020 and GE Capital loans and REMAND for reconsideration of whether Transworld should recover in *quantum meruit*. We further AFFIRM the award to the FDIC for Transworld's breach of its standard of performance, AFFIRM the judgment regarding denial of contractual indemnity, REVERSE the damages award and finding that Transworld converted the RTC's funds, VACATE the accompanying injunction, AFFIRM the denial of recovery for fraud in the inducement, VACATE the award of prejudgment interest, REMAND for recalculation of such interest from the date of June 12, 1994, and AFFIRM the judgment regarding the awards to Transworld for auditing the ARM's and for shortages in the FHLMC account.

It is so ordered.